UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DIEGO BURGOS,

           Plaintiff,

    v.

MICHAEL SEXTON, et al.,

           Defendants.

Case No. 17-cv-06102-WHO

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. No. 1

## INTRODUCTION

Petitioner Diego Burgos seeks federal habeas relief from one count of second degree murder, one count of assault on a child resulting in death, one count of corporal injury to a child, and one count of child endangerment. He raises four potential claims for relief: (1) the investigators continued to interrogate him after he invoked his right to remain silent; (2) the trial court should have granted a mistrial or admonished the jury following a witness's suggestion that Burgos had anally raped the decedent infant; (3) the admission of a photograph showing the decedent infant on life support with a rosary around his neck was so inflammatory that it denied Burgos his Fourteenth Amendment right to a fair trial; and (4) the trial court erroneously instructed the jury under CALCRIM No. 361. For the reasons below, I deny relief on Burgos's claims.

## BACKGROUND

Burgos is a California state prisoner serving a sentence of 37 years to life. He was found guilty by jury of (i) one count of second degree murder, Cal. Penal Code § 187(a); (ii) one count of assault on a child resulting in death, Cal. Penal Code § 273ab(a); (iii) one count of corporal injury to a child, Cal. Penal Code § 273d(a); and (iv) one count of child endangerment, Cal. Penal

Code § 273a(a).  On direct appeal to the California Court of Appeal, Burgos raised all four of his grounds for relief.  The Court of Appeal affirmed the conviction, *People v. Burgos*, No. H039270, 2016 WL 1592189 (Cal. App. April 18, 2016) (Ex. E; Dkt. 13-25), and the California Supreme Court denied review on July 27, 2016.  *People v. Burgos*, No. S234687 (Cal. July 27, 2016) (en banc) (Ex F; Dkt. 13-26).

The California Court of Appeal comprehensively summarized the facts in its April 18, 2016 unpublished opinion, which I quote below:

### A. Family Background

C.M., the 10–month–old victim in this case, was born in late October of 2010 and was removed from life support on September 5, 2011. C.M.'s mother, Aracely M., had another son, E.M., who had been born in September of 2009.

Aracely met defendant at a dance in Salinas and began dating him in February of 2011.  Around May or June of 2011, Aracely and her two children began living with defendant at defendant's parents' home on Clifton Court in Greenfield.  After a few months, Aracely, defendant, and the two children moved to a residence on Sixth Street.  In August of 2011, they moved to a house on Cherry Avenue.  At each residence, the four of them slept in one room together, with the adults on a bed and the children on the floor.

Defendant played with and held E.M. but not C.M.  Defendant told Aracely that he hated C.M.  Defendant called C.M., "Damn brat, damn idiot," and sometimes called him "stupid."  Defendant did not like it when C.M. cried or made noise.  On one occasion, defendant bought food only for E.M. and said he did not like C.M.  Defendant would look at C.M. "with anger" in his eyes.  Defendant once asserted that C.M. "was not going to grow old."

At one point while they were living on Clifton Court, C.M. had a bruise on his head.  When Aracely asked defendant about the bruise, defendant said that C.M. might have hit himself on a table and referred to C.M. as a "stupid brat."  Defendant also posited that E.M. could have caused the bruise.  Defendant later said that he had dropped C.M. on the concrete.

While they were living on Sixth Street, Aracely noticed bruises appear on C.M.'s face and body.  Defendant had "unexplained answers about the bruises."  Before her relationship with defendant, C.M. never got hurt.  C.M. also started to have problems with crawling: he would cry and hold his leg up.  C.M. had previously been crawling and learning to walk.  Aracely asked defendant why C.M. had bruises on his foot, but defendant said that he did not know.

On August 8, 2011, Aracely had a miscarriage.  She had been pregnant with defendant's child for three months.  During her pregnancy, defendant would tell Aracely not to play with C.M. over

2

her stomach so that C.M. could not hurt the baby. Defendant became sad and angry when Aracely had the miscarriage. He blamed C.M., saying, "It is that brat's fault. It is his fault because of the way he would kick you."

When defendant took Aracely for medical treatment for the miscarriage, she instructed him to take care of C.M. Defendant said, " 'I don't know if when you return that damn brat will be dead.' " After Aracely returned home, she noticed a bruise on C.M.'s cheek. She took a photo of the bruise. She told some family members and friends about the bruise and posted the photo on Facebook.

On August 9, 2011, Aracely and defendant exchanged text messages. Aracely asked if defendant remembered pulling C.M. by his feet. Defendant replied, "No, why?" Aracely wrote that she was going to take C.M. to a doctor the next day because he could not move his legs without crying. Aracely said she thought it was either because of "the hit from the car" or when defendant "[p]ulled his legs." Aracely's reference to "the hit from the car" was to an incident in which defendant told her that C.M. was injured because he had been driving too fast. Her reference to defendant pulling C.M.'s legs referred to an incident in which defendant tried to pull C.M. away from Aracely. Defendant's response to Aracely's text was, "Yea maybe." Defendant talked Aracely out of taking C.M. to a doctor.

On the morning of August 17, 2011, Aracely heard C.M. cry as she was preparing food. Defendant asked Aracely what she would do if she saw her son with red eyes. Aracely asked, "What do you mean by that?" Defendant replied, "Oh, nothing," and left. Aracely went to check on C.M. She saw him wiping his eyes, which were red, and crying. C.M. smelled like cologne. Aracely took C.M. to the emergency room. Aracely said she did not know what had happened. She "was trying to cover up" for defendant.

Around August 26, 2011, Aracely noticed some bloody scratches on C.M.'s back and suspected defendant had caused them. The injuries occurred while C.M. was with defendant.

Also around August 26, 2011, Aracely and defendant were having sex or trying to have sex but were interrupted by C.M.'s crying. Defendant looked angry at the time. The next morning, when Aracely got up, she did not notice any bruises on C.M.'s face. Aracely went to the kitchen; defendant and C.M. remained in the bedroom. While in the kitchen, Aracely heard C.M. cry. She ran to the bedroom and saw that C.M. had a bruise on his head. She asked defendant what had happened. Defendant said, "I don't know. That damn idiot is always—he could have hit himself in the closet." Aracely accused defendant of kicking C.M. with his boots, but defendant said nothing and went to work.

Aracely wrote defendant a text message on August 26, 2011: "Umm love I hope that you don't want to take it out with [C.M.] of what we did yesterday???" At trial, Aracely explained that she meant "anal sex." When asked for a further explanation, she replied, "About him doing something to [C.M.]." She continued, "Like violation or something like that. Raping, I mean. It's because I felt like [C.M.]

had reddish—like really red and weird in his back. That's what I meant about that." Aracely asserted that the text message was not related to the incident in which "the sex was interrupted." Aracely had also written a text message stating, "Like always you always want to take it out on him and you hate him so u don't care about wat happens." In that message, she was referring to the bruise on C.M.'s forehead. Aracely had never seen defendant sexually assault C.M.

After defendant returned from work that day, the family went out to eat, but C.M. was sleepy and did not want to eat.

The following day, August 27, 2011, C.M. was crying a lot, like he was in pain, and he had not crawled in more than a week. A Dish Network employee named Filiberto Vizcarra came to the house to do an installation. While Vizcarra was doing the installation, Aracely went to get him some water. Aracely told defendant to hold C.M., and defendant took C.M. from her arms. C.M. became fussy and then started crying. Defendant tried to quiet C.M. down but became "impatient" and said "he won't shut up." Defendant shook C.M. and then threw C.M. on the mattress. When Aracely came back, C.M. was on the bed, crying. She asked defendant what had happened. According to Aracely, defendant did not respond. According to Vizcarra, defendant said, "Well, he won't shut up. He just won't shut up."

On August 28, 2011, Aracely woke up and checked on C.M., who seemed more tired than usual. Although C.M. was breathing, he did not wake up when she checked on him, which was unusual. C.M. and E.M. both slept for much of the day, while Aracely and defendant watched movies. At some point that day, C.M. vomited, and he was unable to eat.

### B. Events of August 29, 2011

On August 29, 2011, Aracely got up around 3:30 a.m. to fix lunch for defendant. C.M. was not very responsive. Aracely left a bottle for him and then went to the kitchen. While making food, Aracely got nervous and had a feeling that defendant was stabbing C.M. She saw "some kind of black shadow" pass through the hallway. The shadow was about defendant's height and was wearing a black sweater like one defendant had.

Aracely went to the bedroom. When she entered, she saw defendant dressed in his black sweater, jeans, and boots. Defendant was kneeling near C.M., blowing on his face and stroking his hair. C.M. was sobbing. Aracely yelled at defendant and asked what had happened. Defendant told her that "he was going to get his sweater and he accidentally kicked him in the head."

Aracely felt dizzy and faint. Defendant told her he would take her to the hospital and that Aracely's mother would take care of the children. Defendant helped Aracely get into the car, then went back to the house. A few minutes later, defendant came back out and began driving. After a while, defendant stopped the car and called Aracely's mother to check on the children. At that point, Aracely stated that she was feeling better and wanted to be home with her children, so defendant drove them back home. As defendant was

helping her out of the car at home, her mother drove up.

Defendant, Aracely, and Aracely's mother all went inside the house and into the bedroom. C.M. made "a sound of pain" when Aracely's mother picked him up. C.M. vomited while Aracely's mother was holding him. Aracely's mother put C.M. back to sleep. Aracely's mother said she would take C.M. to a doctor. Defendant said, "No, don't take him. It's too cold for him outside...."

Aracely's mother left, and Aracely and defendant went back to sleep. Aracely woke up at around 10 a.m. Both children were still sleeping. When defendant woke up, Aracely noticed that he was "really nervous." Defendant was also unusually caring toward C.M., checking on him throughout the day and trying to give him a bottle. Defendant was also unusually caring toward Aracely.

At around 5:00 p.m., Aracely brought C.M. into the kitchen and put him in a stroller so she could make food. Defendant had Aracely put C.M. back in the bedroom, saying that the stroller took up too much space in the kitchen and that he would take care of C.M. Defendant later returned to the kitchen, saying that he had put C.M. to sleep. Aracely started toward the bedroom to make sure C.M. was asleep, but defendant told her that C.M. was okay and asleep, and she did not hear any crying, so she returned to the kitchen.

After making food, Aracely went to the bedroom to check on C.M. She heard C.M. make a sound "[l]ike he couldn't breathe." C.M. looked really pale. His mouth was open and his eyes were rolled up. Aracely picked C.M. up and called for defendant. She asked defendant what was happening; defendant said he didn't know. Aracely put C.M. in bed and told defendant she was going to call 9–1–1. She dialed 9–1–1, but defendant took her cell phone and hung up. Defendant said that Aracely should call her mother instead. Aracely called her mother, who told her to call 9–1–1. Aracely then called 9–1–1 again and reported that her baby was not breathing. At about 8:27 p.m., paramedics arrived, administered to C.M., and transported him to a King City hospital. C.M. was briefly treated at the King City hospital, then flown to Lucille Packard Children's Hospital.

Aracely talked with the police at the King City hospital. Aracely stated that she did not know what had happened and that she did not know of anyone who could have hurt C.M. She lied in order to protect defendant. After an officer warned her that Child Protective Services might take E.M. away from her, Aracely "started saying the truth." She showed the officer cell phone photographs of bruises on C.M. When asked why she would continue leaving C.M. with defendant if she suspected him of hurting C.M., Aracely said that she loved defendant and could not prove that defendant was causing the injuries.

Defendant drove Aracely to Lucille Packard. During the drive, defendant said he had the feeling it was going to be their last drive. When they passed Soledad Prison, defendant said he bet he would be going there. He told Aracely he was sorry for everything.

5

At Lucille Packard, Aracely took some photographs of C.M. in his hospital bed. In one photo, C.M. looked unconscious and had a tube running into his mouth, secured by medical tape. A white shirt was draped over his torso, and a blue beaded rosary was on top of the shirt. Aracely took the photo when C.M. was baptized.

### C. Medical Examinations

When C.M. was evaluated at Lucille Packard, he was on a respirator because he was not breathing well on his own, and there was no indication of brain function. C.M. had external bruises on his cheek, legs, and ankles. X-rays revealed a skull fracture and fractures in his legs and ankles. The skull fracture was fresh and complex, indicating it was caused by a "high energy impact." C.M. had fractures in his legs that were healing; the injuries had likely occurred "more than a couple of weeks" earlier. C.M. also had a new, acute fracture of his femur, which was likely caused by someone twisting or pulling his leg forcefully. C.M. had subdural hematomas, which indicated that his head had been shaken. There was evidence that C.M. had sustained head injuries a few weeks earlier as well. Damage behind C.M.'s eyes indicated that his head had been "snap[ped] around." The three linear bruises to C.M.'s cheeks were a "textbook slap mark."

C.M.'s injuries would not have resulted from C.M. falling out of bed, tripping and falling, running into furniture, or falling down while learning to walk. The only reasonable explanation for the "constellation of injuries" was that they were inflicted by an adult. C.M.'s death was likely caused by an adult grabbing C.M. by the leg and swinging him "like a hammer," causing the back of his head to contact something hard. C.M.'s injuries also indicated "a pattern of abusive behavior for some long time."

On September 5, 2011, life support services were removed from C.M., who eventually stopped breathing. An autopsy of C.M. was performed on September 6, 2011. The autopsy revealed that C.M.'s skull fractures and brain injuries included both recent and prior trauma. The multiple injuries were consistent with C.M.'s head being forcefully struck against a hard, flat surface. Likewise, C.M.'s leg injuries included both recent and prior breaks, and it would have taken "quite a bit of force" to inflict those injuries. According to the doctor who performed the autopsy, the cause of C.M.'s death was a blunt force trauma to the head. C.M.'s head injury had caused so much swelling in his brain that his breathing and heartbeat had stopped, which had caused a lack of blood flow to the brain.

### D. Defendant's Statements

Defendant was interviewed four times by District Attorney investigators Mark Puskaric and Maribel Torres. The first three interviews took place at Lucille Packard on August 30, 2011.

During the first interview, the investigators suggested that defendant might have done something to cause C.M.'s injuries, in an attempt to get C.M. to stop crying. Defendant denied this. He claimed to have no idea how the injuries happened. Defendant referenced Aracely's statements about being afraid that someone was harming C.M. Defendant initially denied even touching C.M., but he later admitted

that he had slowly pulled C.M. by his ankles to move him.  The investigators pointed out that "gently pulling" C.M. by the ankles would not have left bruises.  When the investigators also pointed out that defendant had not explained how C.M. got his head injury, defendant noted that C.M. would often "throw himself" around when he was crying.  Defendant subsequently stated that C.M. had hit his head while defendant was watching television.  The investigators asked defendant about prior bruises on C.M.'s face.  Defendant recalled a bruise on C.M.'s cheek caused by the car seat flipping over.

The second interview began a few minutes after the first interview.  The investigators asked if anyone had visited that day or the day before.  Defendant said that his friend had come over, but he denied that the friend had done anything to C.M.

The third interview began about two hours later, at 9:29 p.m.  Defendant denied having kicked C.M. and denied being mad at C.M. for crying.  Defendant had opened the closet to get clothes for work and accidentally hit C.M. with the closet door, "but not like that hard."  C.M. had not woken up.  Investigator Puskaric asked if defendant had moved C.M. out of the way with his foot or kicked him.  Defendant said he did not remember doing that, but he acknowledged that he sometimes wore steel-toed work boots.  After Investigator Puskaric said he thought defendant's boots would match up to a mark on C.M.'s face, defendant said he had pushed C.M. away from the closet door with his foot, but that he had only socks on, not his boots.

Investigator Puskaric accused defendant of having hit C.M. hard but not on purpose.  After sighing, defendant said, "I don't know, but I think that I just, well, yeah, I hit him."  Defendant explained he had accidentally kicked C.M. when getting his clothes from the closet.  Defendant also admitted he had been wearing his steel-toed boots.  Defendant continued to claim that the impact had not been hard enough to wake C.M.  Defendant denied hitting C.M. any other time or picking him up by his legs.

The fourth interview was on September 1, 2011, after defendant's arrest.  At the beginning of the interview, Investigator Puskaric provided the Miranda advisements to defendant.  (*See Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda* ).)  Defendant denied he had ever played with C.M. by throwing him up in the air or holding him by the ankles.  Defendant also denied saying that he did not like C.M., denied that he got frustrated with C.M.'s crying, and denied blaming C.M. for Aracely's miscarriage.  Defendant claimed not to know how C.M. got the scratches on his back.  Defendant denied that he had ever made a statement about C.M. not growing old, explaining that he might have said that C.M. was "not going to grow up or something."

### *E. Defense Case*

The defense theory was that the evidence failed to prove that defendant, rather than someone else, had inflicted the injuries on C.M.  The defense did not directly blame Aracely but suggested she could have been the perpetrator.

### 1. Defendant's Testimony

Defendant testified that he and Aracely were both 19 years old when they met in February of 2011. He claimed that he loved both E.M. and C.M. "like [his] sons" and denied telling Aracely that he hated C.M. Defendant did not strike C.M. or cause bruises to C.M. when they lived with defendant's parents. When they lived on Sixth Street and Aracely went to the hospital, C.M. did get bruised accidentally. Defendant forgot that C.M. was in the car and drove to the store without securing C.M. in a car seat, so when the car went around a turn, C.M. "went off to the side" and hit his cheek on the car door. When they lived on Cherry Street, he did not harm C.M. in any way.

Defendant claimed he noticed C.M. was having trouble moving his legs when they were living on Sixth Street. Defendant denied being responsible for C.M.'s leg injuries. He claimed he told Aracely to take C.M. to the doctor, but that she never did and she would not allow defendant to do so.

Defendant acknowledged being sad when Aracely had a miscarriage, but he denied blaming anyone for it. When he told Aracely that C.M. was not going to grow old, he meant that C.M. was "not going to be tall, tall like [defendant]."

Defendant denied putting cologne in C.M.'s eyes. He admitted that after he put cologne on one day, he had left the bottle only about two and a half feet off the floor instead of where it should have been stored.

Defendant denied causing the scratches on C.M.'s back. When Aracely accused him of being responsible, he showed her that his fingernails were very short. He did not use any other instrument to scratch C.M. Defendant denied kicking C.M. and causing the bruise on his head. Defendant denied refusing to buy food for C.M.

On Monday, August 29, 2011, Aracely was in the kitchen when defendant got up and went to the bathroom. Both children were still sleeping, but defendant soon heard C.M. start crying. Defendant went back to the bedroom to put his toothbrush away. He noticed C.M. was sweating a lot, so he kneeled down and began to give him air. Aracely entered the bedroom looking weak and pale, then fell down on the floor. Defendant helped her up. Aracely said, "maybe I'm just imagining things" and said that she had seen someone tall, dressed in all black. Defendant decided to take Aracely to the hospital, so he called her mother to come take care of the children. He became impatient and decided to leave with Aracely. He called Aracely's mother after driving for a while and confirmed she was heading to their house. At that point, Aracely was feeling better, so they returned home. Aracely's mother arrived at their house a few minutes later. Defendant told Aracely's mother not to take C.M. out because it was too cold outside. Defendant became worried about C.M. when he continued to sleep and would not get up to eat. He did not take C.M. for medical treatment but would have done so if Aracely had asked him to.

Defendant denied that he would ever take C.M. by the legs and swing him so that his head bashed against a wall. When he was

8

talking to the investigators at the hospital, he was very sad, tired, and confused. Defendant asserted that he had told the truth during the parts of the interview that he remembered. During the third interview, he was tired and angry, so he was "agreeing." He could not remember the questions that he agreed with.

On cross-examination, defendant did not remember hitting C.M. with a closet door, and he did not remember telling investigators about that incident, even after his interview was played. Defendant also did not remember pushing or kicking C.M. with his foot or telling the investigators that he had done so.

### 2. Other Defense Witnesses

Johnny Gonzalez, a supervisor at defendant's workplace, testified that defendant worked 43 to 76 hours per week between February and August of 2011.

Lourdes Lopez, who rented a room in her house to defendant and Aracely, never saw defendant strike or hit C.M. Lopez had entered defendant's and Aracely's bedroom on the day C.M. was taken away by an ambulance. She saw that C.M. looked "bad." Aracely was on the phone with her mother. Lopez told Aracely to call 9–1–1. Defendant was not in the bedroom at the time.

Defendant's father testified that Aracely did not "take care of her children the way a mother should." He asserted that Aracely would not feed C.M. He kicked Aracely out of his house after she broke a stereo with a hammer.

Defendant's mother saw C.M. cry one day while Aracely was "playing with her Facebook." On another occasion, Aracely explained that C.M. was crying because he was hungry and there was no milk.

### F. Convictions and Sentence

The jury convicted defendant of second degree murder (§ 187, subd. (a); count 1), assault on a child causing death (§ 273ab, subd. (a); count 2), corporal injury to a child (§ 273d, subd. (a); count 3), and child abuse likely to produce great bodily injury (§ 273a, subd. (a); count 4), and found that defendant personally inflicted great bodily injury in the commission of counts 3 and 4 (§ 12022.7, subd. (d)). At the sentencing hearing, the trial court imposed a term of 25 years to life for count 2, a consecutive six-year term for count 3, and a consecutive six-year term for the great bodily injury allegation associated with count 3. The trial court stayed the terms for counts 1 and 4 pursuant to section 654.

*Burgos*, 2016 WL 1592189, at *1-7.

### LEGAL STANDARD

Burgos has raised claims in this federal habeas petition that were raised on direct appeal to

the California Court of Appeal. That court, in its unpublished opinion on April 18, 2016,

addressed each of Burgos's claims. The California Supreme Court denied review on appeal. The

9

California Court of Appeal was the last court to present a reasoned decision on these claims, and I review its decision below. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

That said, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

# DISCUSSION

## I. CLAIM 1: INVESTIGATORS UNLAWFULLY CONTINUED QUESTIONING AFTER BURGOS INVOKED HIS RIGHT TO REMAIN SILENT

Burgos asserts that his right to remain silent under *Miranda v. Arizona*, 384 U.S. 436 (1966) was violated when, during his fourth interview, investigators continued to interrogate him after he had repeatedly responded "no" to the investigators queries as to whether he had anything more to add.[1]  Burgos's Memorandum ("Pet.") at 2-3 [Dkt. No. 1].  The relevant transcript reads:

> Puskaric: Well, I wanted to talk with you, uh, a little bit more about that, but things have changed a little bit now, okay?  Things are a little different now because obviously you're in custody now, okay, you've been arrested, so because of all of that, and because you're in custody, I have to advise you of some rights, okay, and, um, but I would like to talk with you, uh, about it, but I need to do this first, okay?  Do you understand that . . .
>
> Burgos: Yeah.
>
> Puskaric: . . . Diego?  Okay, so I'm gonna read these to you.  Uh, if you don't understand, uh, if you don't understand what I'm saying to you, uh, in English, then, uh Investigator Torres can give it to you in Spanish if you need it, okay?
>
> Burgos: Uh, hmm.
>
> Puskaric: Okay.  First of all, you have a right to remain silent. Anything you say can and will be used against you in a court of law. You have a right to talk to a lawyer and to have him present with you while you're being questioned.  And if you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.  Do you understand what I just . . .
>
> Burgos: Yeah.
>
> Puskaric: . . . read to you?  Do you understand that?  Okay, now having all of that, having understanding all of that and having that in mind, uh, I'd like to talk to you again about this whole situation. Would you, are you willing to talk to us about it again?
>
> Burgos: Well, that's the, that's, well, like I don't have like anything what to say.
>
> Puskaric: You don't have anything else to say?
>
> Burgos: No, that's it.
>
> Puskaric: Than what you've already told us?

---

[1] This was Burgos's only custodial interview.

1   Burgos: Yeah.

2   Puskaric: Okay. You don't wanna-, so you understand your rights,
    um, I'd like to ask you a couple questions then about it, I mean, you
3   know, obviously we susp-, we suspect that there's probably more
    that happened than what, that we talked about the last time. You
4   know, I think I even said that to you last time, you know, I thought
    there was more to it, that you just weren't telling us everything . . .

5   Burgos: No, that's it.

6
    Puskaric: That's just it? Alright. Nothing else to add? Alright. Is
7   there anything you wanna tell me that, um, or say to me about this
    incident that maybe I didn't ask you about? Any, maybe some
8   questions I didn't ask you about that you wanna ask me or wanna say
    anything or make any comments or anything?
9
    Burgos: No.
10
    Puskaric: No?
11
    Burgos: No, that's it.
12
    Puskaric: Now you understand, you understand why you're in jail,
13  right?

14  Burgos: Yeah.

15  Puskaric: Okay, and, um, so what's gonna happen is you're gonna go
    to court, uh, I don't know if you'll go to court today, but you'll
16  probably ge-, either today or tomorrow, you'll go to court, and when
    you go to court, you're gonna get an attorney, okay? An attorney'll
17  be appointed to represent you, a lawyer, and so you just be honest
    with that lawyer and, and, and tell him everything he needs to know,
18  okay? 'Cause he's there to help you, okay?

19  Burgos: Uh, hmm.

20  Puskaric: Alright? And is there nothing else more that you wanna
    talk to us about? Okay, um . . .
21
    Torres: If we had . . .
22
    Puskaric: . . . Investigator Torres?
23
    Torres: . . . if we had a couple more, if we had a couple of just, uh,
24  more questions for you, you are willing, would, would that be okay?

25  Burgos: Um, well, yeah.

26  (2 CT 399-402.)

27      If a suspect indicates in any manner during questioning that he wishes to remain silent,

28  interrogation must cease, and any statement obtained thereafter is considered the product of

12

compulsion. *Miranda*, 384 U.S. at 473-74. An accused who wishes to invoke the right to remain silent must do so unambiguously. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (holding that suspect who declined to sign a *Miranda* waiver form and was largely silent during almost three hours of interrogation had not invoked his right to silence); s*ee, e.g., Anderson v. Terhune*, 516 F.3d 781, 786 (9th Cir. 2008) (en banc) (defendant's statement, "I plead the Fifth" was unambiguous and all interrogation should have ceased); *id.* at 790 (state court's determination that "I plead the Fifth" was ambiguous was an unreasonable application of *Miranda* and the state court's finding that the officer's responsive question, "Plead the Fifth. What's that?" was a legitimate clarifying question was an unreasonable determination of the facts). "A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity." *Id.* (omission and alterations in original) (*quoting Davis v. United States*, 512 U.S. 452, 458-59 (1994)).

There are many cases that examine whether a suspect has unambiguously invoked his *Miranda* rights. A suspect who "did not say that he wanted to remain silent or that he did not want to talk with the police" has not invoked his right to remain silent. *Id.* at 382. But a defendant's statement to police officers, "I don't want to talk no more, man" was not ambiguous and the officers should not have continued to question him. *Jones v. Harrington*, 829 F.3d 1128, 1139-41 (9th Cir. 2016) (state court's determination that defendant's statement was ambiguous was either an unreasonable determination of the facts or an unreasonable interpretation of *Miranda*). A simple "No" in response to an officer's inquiry whether a suspect wants to talk to police is not ambiguous either. *Garcia v. Long*, 808 F.3d 771, 780-81 (9th Cir. 2015) (state court's rejection of *Miranda* claim was an unreasonable application of, and contrary to, Supreme Court precedent, as well as an unreasonable determination of the facts when officer gave *Miranda* warnings, asked "'Okay, now having that [i.e., your *Miranda* rights] in mind, do you wish to talk to me?'" and "complete answer was 'No.'"; his later elaborations did not undermine the clarity of the invocation of his right to remain silent).

If the defendant unambiguously and unequivocally invokes his right to remain silent, the

reviewing court cannot look to "clarifying" questions, and the defendant's response to them, to "'cast retrospective doubt on the clarity of the initial request itself.'" *Id.* at 778 (*quoting Smith v. Illinois*, 469 U.S. 91, 93, 100 (1984) (per curiam)). Nor should the reviewing court look to earlier communications with the defendant where police managed to get him to supplement initial "no" answers to determine whether his simple "no" in response to whether he wanted to speak to the police was ambiguous. *Id.* at 779. Statements made by a suspect after police ignore his invocation of his right to remain silent and continue to question him are irrelevant to the adequacy of the suspect's initial invocation of the right to remain silent. *Anderson*, 516 F.3d at 791.

In this case, the California Court of Appeal found that Burgos's responses were not unambiguous invocations of the right to remain silent:

> Here, defendant's responses to Investigator Puskaric's questions were not, in context, unambiguous invocations of the right to remain silent. Defendant was not asked if he wanted to talk to the officers but rather whether he had anything to add to his prior statements. When he responded "No," defendant was telling the officers he had nothing to add, not expressing a request for the interview to end. Viewed objectively, defendant's statements reflected, at most, "only momentary frustration and animosity toward [the investigators]." (*Jennings*, supra, 46 Cal.3d at p. 978; *see also People v. Stitely* (2005) 35 Cal.4th 514, 535 (*Stitely*) [reasonable officer would have concluded that when defendant stated, " 'I think it's about time for me to stop talking,' " he "expressed apparent frustration, but did not end the interview"].) Given the ambiguity, Investigator Torres was entitled to attempt to clarify defendant's intent and desire to waive his *Miranda* rights by asking, if it would "be okay" if the investigators asked a couple more questions of him. (*See Farnam*, supra, 28 Cal.4th at p. 181.) Since defendant responded, "Yes," the investigators reasonably understood defendant to have clarified that questioning could proceed. (*See Stitely*, supra, at p. 535.)

*Burgos*, 2016 WL 1592189, at *10. Burgos has not shown that this conclusion is objectively unreasonable.

To begin, a state court's application of the *Davis* "clear statement" rule to the invocation of the right to remain silent after *Miranda* waiver is not contrary to, or an unreasonable application of, Supreme Court precedent for purposes of § 2254(d). *DeWeaver v. Runnels*, 556 F.3d 995, 1002 (9th Cir. 2009) (no habeas relief available where state court had concluded that suspect asking to be taken back to jail did not evidence a refusal to talk further and was not an invocation of right to remain silent). Burgos makes two arguments against the Court of Appeal's finding.

14

United States District Court
Northern District of California

First, Burgos asserts that the Court of Appeal's decision was contrary to *Miranda*, *Davis*, and *Berghuis*. In support of that contention, he cites *Christopher v. State of Florida*, 824 F.2d 836, 840 (11th Cir. 1987) and *United States v. Poole*, 794 F.2d 462, 466 (9th Cir. 1986). Pet. at 6-7. Both are easily distinguished.

In *Christopher,* the suspect's invocation of his right to remain silent was unambiguous. The suspect categorically stated in that case: "Then I got nothing else to say. If you're accusing me of murder, then take me down there." *Christopher*, 824 F.2d at 840. Here, Burgos stated: "Well, that's the, that's, well, like I don't have like anything what to say." *Burgos*, 2016 WL 1592189, at *8. This can reasonably be read to state that he does not have anything to add to his previous statements, not that he has nothing else to say to the investigators. The questions and answers that followed addressed whether he had more to say "about the whole situation," not whether he was asserting his *Miranda* rights.

In *Poole,* the government conceded that Poole had invoked his *Miranda* rights: the issue the Ninth Circuit addressed was the government's argument that it had the right to obtain background information from the suspect after he invoked his rights. 794 F.2d at 466. After Poole invoked his right to remain silent, the investigator asked him his name, date of birth, and place of birth. *Id.* at 464. Poole gave a false name. At trial, the jury was instructed that the giving of a false name might show consciousness of guilt. *Id.* The opinion does not analyze the questions that preceded the invocation of *Miranda* rights or the sufficiency of Poole's invocation. *See id.* at 466. Instead, the Ninth Circuit was only asked to determine whether asking Poole about his name, date of birth, and location of birth after he had invoked his rights constituted custodial interrogation. *Id.* Here, the issue is whether Burgos invoked his rights; the analysis in *Poole* is not relevant. The Court of Appeal had the entire transcript of the interview with Burgos before it and based its decision on the record.

His second argument is that the Court of Appeal applied the wrong *Miranda* standard to the facts because the cases cited by the Court of Appeal involved post-waiver attempts to invoke the right to silence. Pet. at 7-8 (*citing In re Joe R.* (1980) 27 Cal.3d 496, 515-516; *People v. Martinez* (2010) 47 Cal.4th 911, 949-950; *People v. Stitely* (2010) 35 Cal.4th 514, 534-535;

*People v. Williams* (2010) 49 Cal.4th 405, 433-434)). Burgos also quotes *Williams,* where the court wrote that "whether a suspect has waived the right to counsel with sufficient clarity prior to the commencement of interrogation is a separate inquiry from the question whether, subsequent to a valid waiver, he or she effectively has invoked the right to counsel." 49 Cal. 4th at 427. Burgos does not explain why this holding on an invocation of the right to counsel is applicable to the facts of this case. Nor does he cite to authority that supports his argument that the invocation of a suspect's right to counsel and an invocation of a suspect's right to remain silent are the same. This does not constitute reversible error.

I agree with the Court of Appeal that Burgos did not unambiguously invoke his right to remain silent and his right to remain silent was not violated. That holding was not objectively unreasonable and was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, I need not consider Burgos's argument that he was prejudiced by the alleged violation. Burgos's first claim for federal habeas relief is denied.

## II.      CLAIM 2: FAILURE TO GRANT A MISTRIAL OR ADMONISH JURY AFTER ARACELY'S SUGGESTION THAT BURGOS ANALLY RAPED C.M.

Burgos argues that his Fourteenth Amendment right to due process was violated by the trial court's failure to grant a mistrial or admonish the jury following Aracely's suggestion that Burgos had anally raped C.M. Pet. at 9-12. The Court of Appeal found that this brief exchange was insignificant and that the trial court did not abuse its discretion in failing to grant a mistrial. *Burgos*, 2016 WL 1592189, at *10-11.

Aracely testified that she sent Burgos the following text message: "Umm love I hope that you don't want to take it out with C.M. of what we did yesterday???" 9 RT 2548 [Dkt. No. 13-12]. On direct examination, the prosecutor asked Aracely what she was referring to and Aracely replied, "anal sex." 9 RT 2548-2549. The parties were under the impression that she was referring to the fact that C.M. had interrupted Aracely and Burgos having anal sex. 9 RT 2550.

The relevant transcript of the direct examination of Aracely reads as follows:

> Prosecutor: Do you remember what you were referring to? You said anal sex, but we really don't understand at this point what you mean by that? Not what anal sex is, why you brought it up.

> Aracely: About him doing something to C.M.?
>
> Prosecutor: Doing what to C.M.?
>
> Aracely: Like violation or something like that. Raping, I mean. It's because I felt like C.M. had reddish - like really red and weird in his back. That's what I meant about that. But in that I didn't take any pictures.

9 RT 2549. After this statement, the trial judge ordered a sidebar where defense counsel moved

for a mistrial or for the jury to be admonished to disregard Aracely's statement. 9 RT 2550-2251.

The trial judge denied the motion for a mistrial and declined to admonish the jury.

The California Court of Appeal found that the trial court did not abuse its discretion when

it determined that Burgos's chance of a receiving a fair trial was not irreparably damaged and that

in the context of the entire trial, this brief exchange was insignificant:

> We agree with the Attorney General that the trial court did not abuse its discretion by determining that defendant's chances of receiving a fair trial were not " ' " ' "irreparably damaged" ' " ' " by Aracely's statement explaining her text message about defendant "tak[ing] it out with [C.M.]." (*See Dement*, *supra*, 53 Cal.4th at p. 40.) The issue in this case was whether defendant was the person who had inflicted C.M.'s injuries, which were most likely caused by someone grabbing C.M. by the feet and swinging him like a hammer or a bat so that his head struck a flat, hard surface. The jury heard evidence that someone had previously inflicted similarly shocking injuries upon C.M. Under the circumstances, Aracely's statement expressing a fear that defendant might commit sodomy was unlikely to have significant shock value, particularly since no sex crime was charged and there was no medical testimony about sexual abuse of C.M. Further, because Aracely's attempts to explain the text message were ambiguous and confusing, the trial court reasonably decided to allow the prosecutor to ask leading questions aimed at clarifying that the text message actually referred to C.M. interrupting defendant and Aracely when they were having sex. Although Aracely thereafter claimed she was not referring to interrupted sex, the prejudicial effect of Aracely's statement was minimized by her admission that she had never seen defendant sexually assault C.M. Ultimately, in the context of the entire trial, this brief exchange was insignificant, such that the trial court did not abuse its discretion by failing to grant a mistrial. (*See Bolden*, *supra*, 29 Cal.4th at p. 555.)

*Burgos*, 2016 WL 1592189 at *11.

A person in custody pursuant to the judgment of a state court can obtain a federal writ of

habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or

treaties of the United States, 28 U.S.C. § 2254(a). Accordingly, the admission of evidence is not

subject to federal habeas review unless a specific constitutional guarantee is violated, or the error

17

1    is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due

2    process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d

3    984, 990 (9th Cir. 1986). The due process inquiry in federal habeas review is whether the

4    admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally

5    unfair. *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).

6         There is a due process violation only if there are no permissible inferences that the jury

7    may draw from the evidence. *See Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). "It

8    is well settled that a state court's evidentiary ruling, even if erroneous, is grounds for federal

9    habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due

10   process." *Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th Cir. 1999) (internal citation omitted).

11   Further, "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process

12   Clause has limited operation" and the "defined the category of infractions that violate fundamental

13   fairness" is very narrow. *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal quotation

14   marks omitted).

15        I find that the Court of Appeal's decision was not contrary to, nor an unreasonable

16   application of, the Supreme Court's holdings on the constitutional admissibility of evidence.

17   Aracely's testimony on the meaning of texts she sent to the Burgos were not irrelevant because the

18   texts could help prove or disprove disputed facts relating to Burgos's motives to harm C.M. Cal.

19   Ev. Code. § 210. In light of the age of C.M. and the disturbing extent of his injuries, the Court of

20   Appeal did not make an unreasonable determination of fact in finding that Aracely's statement

21   was unlikely to have additional significant shock value in the context of this trial because there

22   were no sex crimes charged nor medical testimony about sexual abuse.

23        With regards to Burgos's belief that he is entitled to a mistrial, the "decision whether to

24   grant a mistrial is reserved to the broad discretion of the trial judge" *Renico v. Lett*, 559 U.S. 766,

25   774 (2010) (internal quotation marks omitted). Burgos has not identified clearly established

26   federal law to show that a court is constitutionally required, under any circumstances, to grant a

27

28

mistrial.[2]

In sum, the Court of Appeal's decision did not violate clearly established federal law nor result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the trial court proceeding. 28. U.S.C. § 2254(d). As a result, I need not consider Burgos's argument that he was prejudiced by the alleged violation. Burgos's second claim for federal habeas relief is denied.

## III. CLAIM 3: ADMISSION OF A PHOTOGRAPH SHOWING C.M. ON LIFE SUPPORT IN THE HOSPITAL WITH A ROSARY AROUND HIS NECK

Burgos argues that his Fourteenth Amendment right to a fair trial was violated by the admission of a photograph showing C.M. on life support in the hospital with a rosary around his neck because it was so inflammatory as to appeal to the passions of the jury. Pet. at 13-17. He contends that his due process rights were violated because the photograph was not relevant to a disputed issue of material fact and that it was prejudicial. *Id.*

As discussed above, to violate a defendant's right to due process the admission of evidence at trial must have been arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Walters*, 45 F.3d at 1357. Due process is only violated if there are no permissible inferences that the jury may draw from the evidence. *See Jammal*, 926 F.2d at 920. An erroneous state court evidentiary ruling must render the state proceedings so fundamentally unfair as to violate due process. *Rocha*, 194 F.3d at 977-78 (internal citation omitted).

The Court of Appeal found that although the photo could engender sympathy for the victim, it was not so inflammatory as to outweigh its probative value and that the trial court did not abuse its discretion in admitting the photograph. The Court of Appeal also found that even if

---

[2] For this proposition, Burgos cites *People v. Clark*, 52 Cal. 4th 856, 990 (Cal. 2011) (no error found when trial court denied motion for mistrial based on a long delay between the sanity and penalty phases of trial), *People v. Wharton*, 53 Cal. 3d 522, 565 (Cal. 1991) (no error found when trial court admonished jury but denied motion for mistrial after a witness who was injured by a third party suggested it was at the direction of the defendant), and *People v. Guerra*, 37 Cal. 4th 1067, 1113 (Cal. 2006) (finding that under the state of mind exception, the trial court properly admitted witness's statements that she believed defendant came into her house as she napped and that she was afraid of him because it was probative of her lack of consent to sexual intercourse in the attempted rape). These cases are not factually analogous and, at most, underscore the trial court's broad discretion in determining whether to grant a mistrial.

the trial court erred in admitting the photograph, that error would be harmless:

> On appeal, defendant renews his claims that the photo of C.M. was irrelevant and more prejudicial than probative.

> " ' "The rules pertaining to the admissibility of photographic evidence are well-settled.  Only relevant evidence is admissible [citations], and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute.  [Citations.]  Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'  The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.  [Citations.]' [Citation.]  The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence.  [Citations.]" [Citation.]' [Citation.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1166-1167 (Carter ).)

> " 'The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory.  [Citations.]  The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect.  [Citations.]' [Citation.]" (*Carter, supra*, 36 Cal.4th at p. 1167; *see* Evid. Code, § 352 [trial court has discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury"].)

> Defendant first argues that the photograph was not relevant to show the timeline of C.M.'s hospital stay or that he was on life support, because these were not disputed issues at trial.  We disagree.  As the Attorney General contends, the photograph was relevant to corroborate Aracely's testimony about the timeline of C.M.'s injuries and death.  The photograph also illustrated the medical treatment C.M. received, which would help the jurors understand C.M.'s injuries.  The photograph was not "somehow rendered irrelevant simply because defendant did not dispute the cause of death or the nature and extent of the victim's injuries.  [Citations.]" (*People v. Heard* (2003) 31 Cal.4th 946, 975.)

> With respect to the prejudicial effect of the photograph, defendant asserts the prosecution could have taken "a less inflammatory photograph of [C.M.] during his one-week stay at the hospital," i.e., one in which he was not "posed with a rosary."  He describes the photograph as suggesting that C.M. was "a little angel" and stirring up emotions related to "religious belief."  He cites *People v. Gurule* (2002) 28 Cal.4th 557, 624 for the proposition that reference to a victim's religious background carries the potential to inflame the jury's passions against the defendant.

> In *People v. Osband* (1996) 13 Cal.4th 622, the Supreme Court

found that a photograph of the murder victim on her birthday, with Christmas presents, was properly admitted even though it brought tears to the eyes of a testifying relative. (*Id.* at pp. 676-677.) The court held that the photograph was relevant to show that a witness had properly identified the victim and that " '[t]he possibility that [the photograph] generated sympathy for the victim [ ] is not enough, by itself, to compel its exclusion . . .' [Citation.]" (*Id.* at p. 677.)

Here, the fact that C.M. was depicted with a rosary, which could engender sympathy for the victim, did not render it so inflammatory as to outweigh its probative value. The photograph would not have engendered significantly more sympathy than, for instance, the photographs showing C.M. as a smiling toddler in the days before his untimely death. Having reviewed the photograph, we conclude that its probative value was not "clearly . . . outweighed by" its prejudicial effect and thus that admission of the photograph over defendant's objection was not an abuse of the trial court's broad discretion. (*Carter*, *supra*, 36 Cal.4th at p. 1167.)

" 'Even if we were to agree with defendant that the trial court erred in admitting the photographic . . . evidence in question, we nonetheless would conclude that any error in admitting such evidence was harmless under the *Watson* standard.' [Citations.]" (*Carter*, *supra*, 36 Cal.4th at p. 1170; *see People v. Watson* (1956) 46 Cal.2d 818, 836.) The photograph "did not disclose to the jury any information that was not presented through the testimony of witnesses," and it was not particularly inflammatory. (*Carter*, *supra*, at p. 1170.) Thus, it is not reasonably probable that the admission of the photograph affected the jury's verdict.

*Burgos*, 2016 WL 1592189, at *12-13.

Burgos has not shown that the Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law. The Ninth Circuit has found no constitutional error in admitting more shocking photographs than the one about which Burgos complains. In *Batchelor v. Cupp*, the Ninth Circuit upheld the introduction of several photographs of a victim's body that was discovered by the police after it was dragged from the bedroom to the living room, causing the victim's night clothing to bunch up around her shoulders. 693 F.2d 859, 865 (9th Cir. 1982). When the police found the body, her torso and legs were covered by two blankets, yet the state's photographs included shots with and without the blankets. *Id.* The defense objected to the latter photographs of the victim's naked body, and in particular those exposing her unwounded genital area and lower body. *Id.* The *Batchelor* petitioner argued that these photos added no probative value to any element of the crime and were not needed to show that the victim was dragged, as this was not a disputed fact; that the trial court should have

21

exercised its discretion to not admit the pictures showing the genital area; and that the pictures were designed to suggest the issue of rape, a crime not charged, in violation of due process. *Id.* The Ninth Circuit disagreed, holding that because the "admission of photographs lies largely within the discretion of the trial court, whose ruling will not be disturbed on due process grounds in a federal habeas corpus proceeding unless the admission of the photographs rendered the trial fundamentally unfair" . . . the "trial court did not commit error, much less error of constitutional magnitude in admitting the photographs." *Id.*

Burgos cites *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), where Holley challenged his conviction for child molestation, lewd and lascivious conduct, and indecent exposure. *Id.* The trial court admitted evidence of sexually explicit materials taken from Holley's bedroom "including a matchbook cover titled 'When I was a Year Old,' which depicted a baby boy with unnaturally large genitals, and three pornographic magazines entitled 'Barely Legal,' 'Baby Face,' and 'Barely 18.'" *Id.* The magazines contained only images of adult women. *Id.* The Ninth Circuit held that the "jury could have drawn no permissible inferences from either the matchbook or the magazines[.]" *Id.* Regarding the matchbook, the court reasoned that "far from reflecting a sexual interest in prepubescent girls, [it] reflects, if anything, an off-color sense of humor, as it at best expressed a joke about a man's endowment." *Id.* (internal quotation marks omitted). The magazines were found to be "similarly irrelevant, as they depict[ed] adult women, not prepubescent girls" and thus the "only inference to be made from these magazines [was] that Holley had a sexual interest in young-looking adult women." *Id.* The Ninth Circuit found that "in the absence of a limiting instruction, the likely influence of this evidence on the jurors was to persuade them that Holley had a dirty mind because he engaged in off-color humor and bought pornographic, and likely offensive, magazines." *Id.* It ruled that "evidence presented was both irrelevant and highly likely to be prejudicial, with a substantial and injurious effect on the jury's verdict" and that the Holley was denied a fair trial as a result. *Id.*

The subject photograph of C.M. is much more like the photograph of the victim in *Batchelor* than the unrelated evidence in *Holley*. The photograph of C.M. would not lead to the same sort of impermissible inferences as the sexually explicit materials in *Holley*. The admission

22

of a more inflammatory and arguably less relevant photographs in *Batchelor* did not constitute constitutional error, 693 F.2d at 865, and neither does the photograph in this case. As the Court of Appeal found, there were probative aspects of C.M.'s photograph, and if there was any error in admitting it, the error was harmless.

The admission of the photo of C.M. on life support with a rosary did not violate Burgos's right to due process. Accordingly, I need not consider his argument that he was prejudiced by the alleged violation. Burgos's third claim for federal habeas relief is denied.

## IV. CLAIM 4: THE TRIAL COURT'S DECISION TO INSTRUCT THE JURY UNDER CALCRIM NO. 361

Burgos argues that his Sixth Amendment right to a fair trial and Fourteenth Amendment right to due process were violated when the trial court instructed the jury under CALCRIM No. 361. CALCRIM No. 361 was provided to the jury as follows:

> If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not by itself -- is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt.

> If the defendant failed to explain or deny, it's up to you to decide the meaning and importance of that failure.

(17 RT 4935-4936; see 2 CT 510.)

A challenge to a jury instruction solely as an error under state law does not state a cognizable claim in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991); *Stanton v. Benzler*, 146 F.3d 726, 728 (9th Cir. 1998) (state law determination that arsenic trioxide is a poison as a matter of law, not element of crime for jury determination, not open to challenge on federal habeas review); *Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (failure to define recklessness at most error of state law where recklessness relevant to negate duress defense and government not required to bear burden of proof of duress). Nor does the fact that a jury instruction was inadequate by Ninth Circuit direct appeal standards mean that a petitioner who relies on such an inadequacy is entitled to habeas corpus relief from a state court conviction. *See Duckett v. Godinez*, 67 F.3d 734, 744 (9th Cir. 1995) (*citing Estelle*, 502 U.S. at

71-72).

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the deficient instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle*, 502 U.S. at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). This is because the defined category of infractions that violate fundamental fairness is very narrow: "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Estelle*, 502 U.S. at 73. The instruction may not be judged in artificial isolation, but must be considered in the context of the overall charge to the jury as a component of the entire trial process. *See Estelle*, 502 U.S. at 72; *United States v. Frady*, 456 U.S. 152, 169 (1982) (*citing Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d 314, 317 (9th Cir. 1988).[3]

The Court of Appeal found that the jury instruction was properly given as Burgos claimed a lack of memory as to some of the incidents preceding C.M.'s death:

> "CALCRIM No. 361 rests on the logical inference that if a person charged with a crime is given the opportunity to explain or deny evidence against him [or her] but fails to do so (or gives an implausible explanation), then that evidence may be entitled to added weight." (*People v. Vega* (2015) 236 Cal.App.4th 484, 496.)

> "The pertinence of CALJIC No. 2.62 depends upon the facts of the case. [Citation.] If the defendant has not been asked a question

---

[3] *See also Middleton v. McNeil*, 541 U.S. 433, 434-35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law); *Mayfield v. Woodford*, 270 F.3d 915, 922-24 (9th Cir. 2001) (no error where court allowed the jury to consider "such guilt phase instructions as it found applicable" for the penalty phase (raising concerns that they would rely on instructions precluding consideration of mitigating factors) because when viewed as a whole the instructions required the jurors to consider all relevant mitigating evidence for the penalty phase); *cf. Chambers v. McDaniel*, 549 F.3d 1191, 1199-00 (9th Cir. 2008) (finding constitutional error where, in addition to erroneous instruction on premeditation, murder instructions as a whole and state's emphasis on erroneous instruction in closing argument allowed jury to convict petitioner of first-degree murder without finding separately all elements of the crime); *Lankford v. Arave*, 468 F.3d 578, 585-87 (9th Cir. 2006) (pre-AEDPA capital case stating additional, proper instructions did not cure incorrect accomplice testimony instructions where conscientious jury might read instructions in a way that permitted conviction on alternative legal theories, one of which was legally incorrect, and verdict hinged on accomplice's testimony).

calling for an explanation or a denial, as a matter of law the instruction may not be given. [Citation.] Additionally, if the defendant does not answer such a question because of some fact which precludes his [or her] knowledge of it (like an alibi which removes him from the scene), a denial of guilt is deemed to have been made. [Citation.] If he [or she] fully accounts for his [or her] whereabouts and denies the crime, the mere fact that defendant's story is contradicted by other prosecution evidence does not pave the way for giving the instruction, because contradiction is not by itself a failure to explain or deny. [Citations.] However, if the defendant tenders an explanation which, while superficially accounting for his [or her] activities, nevertheless seems bizarre or implausible, the inquiry whether he [or she] reasonably should have known about circumstances claimed to be outside his [or her] knowledge is a credibility question for resolution by the jury. [Citations.]" (*People v. Mask* (1986) 188 Cal.App.3d 450, 455.)

Defendant contends that the instruction is applicable "only where the defendant fails to explain or address whole portions of the prosecution's case." However, the cases he cites do not support his contention; they stand for the proposition that where a defendant testifies about only certain crimes, an instruction such as CALCRIM No. 361 may be given regarding his or her failure to deny additional crimes. (*See People v. Ing* (1967) 65 Cal.2d 603, 611-612; *People v. Perez* (1967) 65 Cal.2d 615, 621; *People v. Thorton* (1974) 11 Cal.3d 739, 760, 114 Cal.Rptr. 467, 523 P.2d 267, disapproved on another ground by *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12.)

Defendant asserts that the instruction was not warranted because he "denied every component of the prosecution's case." (*See People v. Marks* (1988) 45 Cal.3d 1335, 1346 [instruction on failure to explain or deny evidence was unwarranted where defendant "testified extensively to a version of the events that contradicted the prosecution's case in all important respects"].) Defendant points out that on both direct and cross-examination, he denied inflicting the bruises on C.M.'s cheek, scratching C.M.'s back, fracturing C.M.'s legs, spraying cologne in C.M.'s eyes, kicking C.M., and killing C.M.

Defendant acknowledges that he claimed a lack of memory as to some of the incidents preceding C.M.'s death, but he asserts that "failure of recall is not a proper basis to give the instruction." Defendant relies on *People v. De Larco* (1983) 142 Cal.App.3d 294 (*De Larco*), in which the defendant was convicted of second degree burglary based on testimony by an eyewitness who saw the defendant inside an auto repair shop late at night and evidence that the defendant's fingerprint was on a flashlight inside the shop. (*Id.* at pp. 298-299.) At trial, the defendant explained that he had handled some tools while visiting a friend at the shop several days before the burglary (*id.* at p. 299), but he claimed he did not recall touching the flashlight. (*Id.* at p. 309.) The appellate court determined that the trial court had erred by giving an instruction on the defendant's failure to deny evidence, explaining, "Obviously, if defendant admitted having touched tools in the shop days prior but could not specifically remember the flashlight, and in addition denied having

been in the shop that evening, he could not disclose any further facts that would shed light on his innocence." (*Ibid.*)

Other cases have held that a defendant's claimed lack of memory of certain events can support the giving of an instruction on failure to deny evidence. For instance, the instruction was properly given in *People v. Sanchez* (1994) 24 Cal.App.4th 1012, where the defendant "gave detailed and specific testimony" about consuming alcohol on the day of the crimes "but had no memory of inculpatory events during that same afternoon." (*Id.* at p. 1030.) The instruction was also properly given in *People v. Kozel* (1982) 133 Cal.App.3d 507 (*Kozel* ), where the defendant's "lack of memory was selective" and the jury "could have found that [this memory loss] was feigned." (*Id.* at p. 531.)

In this case, on cross-examination, defendant claimed he did not remember hitting C.M. with a closet door, and he did not remember telling investigators about that incident, even after his interview was played. He also did not remember pushing or kicking C.M. with his foot or telling the investigators that he had done so. Defendant's claimed lack of recall pertained to very significant facts about the *cause of C.M.'s injuries, which distinguishes the instant case from De Larco*, where the defendant claimed not to remember the particular objects he touched while at an automotive shop. Here, as in *Kozel*, the evidence supports the conclusion that defendant's "lack of memory was selective" and that defendant had feigned his failure to recall the closet door incident and significant portions of his statements to the police. (*Kozel*, supra, 133 Cal.App.3d at p. 531.) Thus, CALCRIM No. 361 was properly given.

*Burgos*, 2016 WL 1592189, at *14-15.

First, Burgos attacks the Court of Appeal's finding by citing several Supreme Court cases for the proposition that jury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of each charged offense, including failure to instruct on an element of the offense, or an instruction directing the jury to find an element against the defendant, violate a defendant's right to a jury trial and the due process requirement that all elements of an offense be proven beyond a reasonable doubt. Pet. at 18-19 (*citing Sullivan v. Louisiana*, 508 U.S. 275 (1993); *United States v. Gaudin*, 515 U.S. 506 (1995); *Apprendi v. New Jersey*, 530 U.S. 466 (2000)). There are two problems with that argument. CALCRIM No. 361 did not alter the prosecution's burden or direct the jury to find an element against Burgos such that it rendered his trial fundamentally unfair or infringed on his constitutional rights. *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009). The instruction did not advise the jury that it was required to draw an adverse inference or alter the burden of proof. Rather, the instruction only allowed the jury to

consider whether Burgos failed to explain or deny certain evidence and, if he did, what the consequences should be. Moreover, the Supreme Court cases to which he cites are not on point. *See Sullivan*, 508 U.S. at 277 (instruction on definition of reasonable doubt was constitutionally deficient); *Gaudin*, 515 U.S. at 506 (trial court took the element of materiality away from the jury); *Apprendi*, 530 U.S. at 466 (holding that that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt).

Burgos's contention has other holes as well. The Court has held that a testifying defendant "may not stop short in his testimony by omitting and failing to explain incriminating circumstances and events already in evidence in which he participated and concerning which he is fully informed, without subjecting his silence to the inferences to be naturally drawn from it." *Caminetti v. United States*, 242 U.S. 470, 494 (1917). And while CALCRIM No. 361 has been challenged in numerous petitions for habeas corpus in California federal courts, no court has found it to be contrary to a rule of law contained in a Supreme Court decision. *See e.g. Vega v. Montgomery*, No. 16-cv-05145-YGR, 2017 WL 4808606 (N.D. Cal. Oct. 24, 2017); *Wildman v. Arnold*, No. 16-cv-08570, 2017 WL 8186436 (C.D. Cal. Sept. 25, 2017); *Hammler v. Kate*, No. 12-cv-4700, 2015 WL 10376323 (C.D. Cal. Nov. 19, 2015); *Carter v. Swarthout*, No. 11-cv-1242-RS(PR), 2013 WL 4551524 (N.D. Cal. Aug. 27, 2013); *Green v. Busby*, No. 11-cv-01844, 2011 WL 6968029 (C.D. Cal. Dec. 1, 2011); *Lopez v. Salinas*, No. 10-cv-02325, 2011 WL 1743690 (E.D. Cal. May 6, 2011); *Rodriguez v. Uribe*, No. 09-cv-04283, 2009 WL 6522726 (C.D. Cal. Dec. 10, 2009). CALCRIM No. 361 is not facially unconstitutional.

Burgos next argues, as in his case before the Court of Appeal, that the trial court incorrectly applied CALCRIM 361 in a way that denied him due process. He contends that the instruction may only be given when the defendant fails to explain or address whole portions of the prosecution's case. Pet. at 19; *Burgos*, 2016 WL 1592189, at *14. But none of the cases he cites support his argument. *See People v. Ing*, 65 Cal. 2d 603, 609-10 (Cal. 1967) (instruction was proper where defendant failed to deny or explain evidence of uncharged offenses), *People v. Perez*, 65 Cal. 2d 615, 621 (Cal. 1967) (same as to charged and uncharged offenses); *People v.*

27

*Thornton*, 11 Cal. 3d 738, 760 (Cal. 1974) (instruction permitting jury to draw adverse inferences from refusal to answer at cross examination was not in error). These cases do not stand for the proposition that CALCRIM 361 may *only* be given when the defendant fails to explain or address whole portions of the prosecution's case. He also refers to *People v. Marks*, 45 Cal. 3d 1335, 1346, (Cal. 1988) to argue that the instruction is not allowed where the defendant's testimony contradicts the prosecution's case. But *Marks* does not hold that a simple contradiction by the defendant makes the instruction erroneous. In that case, the court was persuaded by the defendant's extensive testimony of his own version of the events that contradicted the prosecution's case in all important respects. *Id.* Despite Burgos's assertions to the contrary, that is simply not the case here.

Citing *People v. De Larco*, 142 Cal. App. 3d 294, 309 (Cal. Ct. App. 1983), Burgos next argues that the instruction is improperly given when the defendant's testimony is only that he does not remember or cannot recall details or events. *De Larco* is distinguishable on its facts. In that case, the defendant was convicted of burglarizing an automotive shop. *Id.* at 298-99. His fingerprint was found on a flashlight in the shop. *Id.* At trial, he testified that he had previously visited a friend who worked at the shop and touched a number of tools during that visit, although he did not specifically remember touching the flashlight. *Id.* The trial court gave the challenged instruction to the jury based on the fact that the defendant failed to recall touching the flashlight. *Id.* at 309. The Court of Appeal held that giving the instruction was improper because the claimed lack of memory was related to something as trivial as which particular objects he touched while vising his friend in the shop. *Id.* Here, the claimed lack of memory does not concern trivial subject matter.

The Court of Appeal here reasonably determined that the evidence supported the instruction because Burgos failed to plausibly explain or recall several facts within his knowledge at trial. On the stand, Burgos stated that he did not recall a litany of events that he had already described to investigators, including: (i) that he had hit C.M. with the closet door; (ii) whether he had been asked about kicking C.M. in the head; (iii) that he had first moved C.M.'s head with his foot without his boots on, but then stating that he had done so with his boots on; (iv) that he had

28

been asked by investigators whether he had stepped on C.M.; (v) that he told investigators that he had stepped on C.M. "just with . . . the tip[;]" (vi) that he had not seen any bruises on C.M.; (vii) that he had told investigators that he had never seen any bruises on C.M.; and (viii) that he had lifted C.M. up by the waist. RT 4270-72, 4507-08, 4512, 4515-21, 4525 4535-36; Ex. E at 28; CT 271. The Court of Appeal reasonably concluded that the evidence supported the conclusion that Burgos's lack of memory was selective and that CALCRIM No. 361 was properly given.[4]

Even if, as Burgos argues, CALCRIM No. 361 did not apply to the evidence, any possible prejudicial effect of giving the instruction was mitigated by CALCRIM No. 200. CALCRIM No. 200 instructs the jury to follow only the instructions that apply to the facts as the jury finds them. CT 4923-24.

CALCRIM No. 361 was properly given. Burgos has not shown that the Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, I need not consider his argument that he was prejudiced by the alleged violation. Burgos's fourth claim for federal habeas relief is denied.

## CONCLUSION

Burgos's four claims are denied. His petition for a writ of habeas corpus is dismissed.

**IT IS SO ORDERED.**

Dated: April 15, 2019

William H. Orrick
United States District Judge

---

[4] For this reason, Burgos's argument that the instruction was unsupported by the trial evidence also fails. Pet. at 19-20.